IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JAN 2 4 2025

MITCHELL R. ELFERS
CLERK

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

**RICARDO MENDEZ, a.k.a. Rick Mendez,**

        Defendant.

Cr. No. 25-139 DHU

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties notify the Court of the following agreement between the United States of America, by the United States Attorney for the District of New Mexico, and the Defendant, Ricardo Mendez, with the advice and counsel of his attorney, Wayne Baker. This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## REPRESENTATION BY COUNSEL

1.      The Defendant understands the Defendant's right to be represented by an attorney and is so represented. The Defendant has thoroughly reviewed all aspects of this case with the Defendant's attorney and is fully satisfied with that attorney's legal representation.

## RIGHTS OF THE DEFENDANT

2.      The Defendant further understands the Defendant's rights:

    a.      to be prosecuted by indictment;

    b.      to plead not guilty, or having already so pleaded, to persist in that plea;

1

    c.     to have a trial by jury; and

    d.     at a trial:

        i.     to confront and cross-examine adverse witnesses,

        ii.     to be protected from compelled self-incrimination,

        iii.     to testify and present evidence on the Defendant's own behalf, and

        iv.     to compel the attendance of witnesses for the defense.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

3.     The Defendant agrees to waive these rights and to plead guilty to Count 1 of the information, charging a violation of 18 U.S.C. § 1962(d), that being RICO Conspiracy; Counts 2 through 6 of the information, charging a violation of 18 U.S.C. § 666(a)(2), that being Bribery of an Agent of an Organization Receiving Federal Funds; Count 7 of the information, charging a violation of 18 U.S.C. § 1951(a), that being Interference with Commerce by Extortion Under Color of Official Right, 18 U.S.C. § 2, Aiding and Abetting; and Count 8 of the information, charging a violation of 18 U.S.C. § 1951(a), that being Conspiracy to Commit Interference with Commerce by Extortion Under Color of Official Right, in violation of 18 U.S.C. § 1951(a).

## SENTENCING

4.     As to Count 1, 7, and 8 in the information, the Defendant understands that the maximum penalty provided by law for this offense is:

    a.     imprisonment for a period of not more than 20 years;

    b.     a fine not to exceed the greater of $250,000 or twice the pecuniary gain to the Defendant or pecuniary loss to the victim;

    c.     a term of supervised release of not more than three years to follow any term of imprisonment. (If the Defendant serves a term of imprisonment, is then

released on supervised release, and violates the conditions of supervised

release, the Defendant's supervised release could be revoked — even on the

last day of the term — and the Defendant could then be returned to another

period of incarceration and a new term of supervised release.);

    d.    a mandatory special penalty assessment of $100.00; and

    e.    restitution as may be ordered by the Court.

    5.    As to Counts 2 through 6 in the information, the Defendant understands that the

maximum penalty provided by law for this offense is:

    a.    imprisonment for a period of not more than 10 years;

    b.    a fine not to exceed the greater of $250,000 or twice the pecuniary gain to the

Defendant or pecuniary loss to the victim;

    c.    a term of supervised release of not more than three years to follow any term of

imprisonment. (If the Defendant serves a term of imprisonment, is then

released on supervised release, and violates the conditions of supervised

release, the Defendant's supervised release could be revoked — even on the

last day of the term — and the Defendant could then be returned to another

period of incarceration and a new term of supervised release.);

    d.    a mandatory special penalty assessment of $100.00; and

    e.    restitution as may be ordered by the Court.

    6.    The parties recognize that the federal sentencing guidelines are advisory and that

the Court is required to consider them in determining the sentence it imposes. The Defendant

further recognizes that while the Defendant's attorney may have made a prediction or estimate of

the sentence that the Court may impose, the Defendant understands that the Court is not bound by any such estimate or prediction.

## **ELEMENTS OF THE OFFENSE**

7.     If this matter proceeded to trial, the Defendant understands that the United States would be required to prove, beyond a reasonable doubt, the following elements for violations of the charges listed below:

Count 1: 18 U.S.C. § 1962(d), that being RICO Conspiracy:

*First*:       A conspiracy or agreement, as detailed in the information, existed between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity;

*Second*:       that defendant deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose; and

*Third*:       the defendant agreed that someone, not necessarily the defendant, would commit at least two of the racketeering acts detailed in the information.

Counts 2 through 6: 18 U.S.C. § 666(a)(2), that being Bribery of an Agent of an Organization Receiving Federal Funds:

*First*:       The defendant gave, offered, or agreed to give a thing of value to another person;

*Second*:       The person was an agent of a local government agency, that being the Albuquerque Police Department (APD);

*Third*:       The defendant did so corruptly with the intent to influence or reward the agent of the organization or agency in connection with some business, transaction, or series of transactions of the APD;

*Fourth:*       this business, transaction, or series of transactions involved $5,000 or more; and

*Fifth:*      the government agency, in a one-year period, received benefits of more than $10,000 under any Federal program involving a grant, contract subsidy, loan, guarantee, insurance or other assistance.

Count 7: 18 U.S.C. § 2, that being Aiding and Abetting:

*First*:      Every element of charged crime in Count 7 was committed by someone other than the defendant; and

*Second*:      The defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the United States must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

Count 7: 18 U.S.C. § 1951(a), that being Interference with Commerce by Extortion Under Color of Official Right:

*First*:      A person wrongfully obtained property from another with consent;

*Second*:      A person involved in the commission of the offense did so under color of official right; and

*Third*:      The conduct affected interstate commerce.

Count 8: 18 U.S.C. § 1951(a), that being Conspiracy to Commit Interference with Commerce by Extortion Under Color of Official Right:

*First*:      The defendant agreed with at least one other person to commit interference with commerce by extortion under color of official right;

*Second*:      The defendant knew the essential object of the conspiracy;

*Third*:      The defendant knowingly and voluntarily participated in the conspiracy; and

*Fourth:*      There was interdependence among the members of the conspiracy; that is, the members, in some way or

manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

## DEFENDANT'S ADMISSION OF FACTS

8.      By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense(s) to which I am pleading guilty. I recognize and accept responsibility for my criminal conduct. Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the offense(s) to which I am pleading guilty beyond a reasonable doubt, including any facts alleged in the information that increase the statutory minimum or maximum penalties. I specifically admit the following facts related to the charges against me, and declare under penalty of perjury that all of these facts are true and correct:

9.      In 2007, I began working for co-conspirator 1's law firm, which specialized in defending persons charged with driving while intoxicated (DWI). As part of my experience working for co-conspirator 1, I am aware of and am familiar with the DWI laws and regulations in New Mexico. I understand that there are state criminal charges associated with DWI arrests, and that there are administrative proceedings handled through the Motor Vehicle Department (MVD) related to the revocation of the persons' driver's licenses (the MVD proceedings).

10.     Since at least 2008, I admit that I conspired with co-conspirator 1, as well as sworn law enforcement officers and deputies with the Albuquerque Police Department (APD), New Mexico State Police (NMSP), and the Bernalillo County Sheriff's Office (BCSO) (collectively, "the Officer Members") to engage in a scheme that targeted persons arrested for DWI (DWI Offenders). Under this scheme, co-conspirator 1, the officers, and I would arrange for the Officer Members to intentionally fail to appear at required criminal and administrative

6

settings associated with the DWI-related arrests, allowing co-conspirator 1 to move to dismiss the proceedings.

11.      I admit that, since at least 2008, this DWI scheme I participated in constituted an enterprise (the DWI Enterprise) that engaged in a pattern of racketeering activity that included multiple acts of bribery, chargeable under New Mexico state law, as well as multiple acts of interference commerce by extortion. I further admit that the DWI Enterprise was an ongoing organization with members who functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise. As part of this conspiracy, I admit that I agreed to commit, and did commit, at least two acts of racketeering in the conduct of the affairs of the DWI Enterprise.

12.      As part of the scheme, DWI Offenders, both aware and unaware of the scheme, retained co-conspirator 1 as their attorney following their DWI arrests. Co-conspirator 1 and/or I consulted with the DWI Offender and strongly encouraged that the attorney retainer fee be paid in cash. When the DWI Offender paid the cash retainer, co-conspirator 1 and I were paid cash in addition to their law firm salary. In addition, the Officer Members were often paid in cash but, at times, also received other benefits and things of value, including but not limited to free legal services, gift cards, hotel rooms, and other gifts. I typically handled communications with the officers to convey the payment amounts and to arrange meetings to exchange payments. However, on occasion, I admit that co-conspirator 1 paid the Officer Member directly.

13.      In terms of the payment amount the DWI Enterprise members would receive, I admit that there was generally a set amount, but there were also exceptions depending on various factors, including the circumstances of the DWI arrest, the DWI Offender's criminal history (specifically if the offender was facing felony DWI charges based on their prior DWI

convictions), the amount of money the DWI Offender appeared to have, and the DWI Offender's personal relation to DWI Enterprise members.

14.    I further admit that co-conspirator 1 would also provide free or significantly discounted legal services for the Officer Members and their family members in exchange for the officer not showing up for the required administrative and criminal settings and to develop goodwill between the Officer Member and the DWI Enterprise.

15.    To execute the scheme, I admit that we (the DWI Enterprise members) developed a system to coordinate the scheduling of the MVD hearing and criminal settings to ensure that the Officer Member would be able to miss the required settings, which, in turn, allowed co-conspirator 1 to use the Officer Member's failure to appear as a basis to request dismissal of the proceeding even though co-conspirator 1 was aware that the Officer Member had been paid to not appear. Once the DWI Offender retained co-conspirator 1, co-conspirator 1, the Officer Member, and I would coordinate the Officer Member's non-appearance at required settings on the state criminal case and the MVD administrative proceeding.

16.    When the Officer Member failed to appear as arranged, I admit that co-conspirator 1 would move to dismiss the criminal case and the MVD proceeding. Because the Officer Member was a necessary witness and because the Officer Member did not appear as required, I admit that co-conspirator 1, the Officer Member, and I knew that the case and proceeding would likely be dismissed. I further admit that, because the state criminal charges were dismissed, the fines, fees, and interlock requirement that would otherwise have applied to the DWI conviction were not imposed. In addition, I admit that, because the DWI Offender's driver's license was not revoked, the DWI Offender was allowed to continue to drive without restriction.

17.     Before March 2022, I understand that an officer missing a pretrial interviews (PTI), or multiple PTIs, typically guaranteed the dismissal of a DWI case because, once requested by a defendant, officer PTIs became a required part of state court discovery. I further admit that, for state criminal cases prior to 2022, co-conspirator 1, the Officer Member, and I would agree that the Officer Member would not appear at the PTI. I admit that dismissal of the state criminal case often occurred as a sanction for the State's discovery violation, and that co-conspirator 1, the Officer Member, and I manufactured this discovery violation by having the Officer Member intentionally not appear at the PTIs.

18.     I also understand that the New Mexico state rules related to PTIs on misdemeanor DWI cases were changed in 2022, and PTIs were no longer conducted on those cases. Following that, I admit that co-conspirator 1, the Officer Member, and I worked out another method to guarantee dismissal of the state criminal DWI-related offenses. I admit that because we were no longer able to manipulate Officer Members' appearances at PTIs, co-conspirator 1, the Officer Members, and I agreed that the Officer Member would not appear at the criminal DWI motion hearings or trial settings. When the Officer Member failed to appear at court, co-conspirator 1 moved to dismiss the case because a necessary witness for the state would not be present. I admit that this allowed us to continue to guarantee that cases would be dismissed even though PTIs were no longer required as part of the State discovery process.

19.     As the scheme evolved over the years, I admit that several Officer Members with APD began referring cases to co-conspirator 1 and me to secure and increase payments to themselves and to the DWI enterprise and to grow the DWI Enterprise. I admit that the Officer Members often retained MVD paperwork and driver's licenses, and then provided them to me. Officer Members also frequently provided me the DWI Offender's phone number, if obtained as

part of the DWI incident. Typically, I would reach out to the DWI Offender referred by the Officer Member and alert the DWI Offender that I knew about the DWI arrest (even though often this was before any documentation about the arrest was publicly available). I admit that I would arrange a time for the DWI Offender to meet with co-conspirator 1 and/or me, typically at co-conspirator 1's law firm. Co-conspirator 1 and I would show the DWI Offender their driver's license (which had been seized in connection to the DWI arrest). Co-conspirator 1 and/or I would then inform the DWI Offender that, if they hired co-conspirator 1 as their attorney, they would not have to worry about the DWI arrest. At times, co-conspirator 1 and/or I would guarantee that the DWI criminal case and MVD process would be dismissed. If the DWI Offender did not retain co-conspirator 1 as their lawyer, the Officer Member would typically proceed with the DWI case as required, thereby usually securing a DWI conviction against the DWI Offender.

20.     While Officer Members included officers from APD, BCSO, and NMSP, I admit that APD had the most Officer Members. To ensure that APD DWI officers were able to keep participating in the scheme over the years, I admit that I was aware that other APD Officers Members who had worked in the DWI unit and were part of the scheme would help recruit and train the next generation of Officer Members. I admit that the more senior APD Officer Members helped recruit officers to join the DWI Enterprise, frequently personally introduced them to me, and often assured the Officer Member recruit about the success of the DWI Enterprise. I also admit that more senior APD Officer Members also provided me the personal cell phone numbers for the recruits, which allowed me to have direct access to the newly recruited Officer Members. In addition, more senior APD Officer Members would tell me which officers the DWI Enterprise should avoid (meaning which officers were likely to report the DWI Enterprise's criminal activity). In recent years, more senior APD Member Officers began asking for a "referral fee"

from co-conspirator 1 and me as payment for having recruited another Officer Member to join the DWI Enterprise.

21.     I further admit that, when I would meet with the recruits to bring them into the DWI Enterprise, I would often discuss many of the other Officers Members who had been and were part of the DWI Enterprise from the different law enforcement agencies (APD, NMSP, and BCSO). I admit I did so to allow the recruit to feel more comfortable joining the DWI Enterprise because of the number of senior, and often high-ranking, officers who were also Officer Members. I understand and admit that this generational participation, particularly within APD, allowed the DWI Enterprise to take root amongst almost the entire APD DWI unit over a lengthy period of time. I also admit that co-conspirator 1, other Officer Members, and I asked more senior APD Officer Members to use their positions and influence within APD to try to ensure that the DWI officers were not investigated or disciplined in connection with their illegal activity.

22.     I admit that the purpose of the DWI Enterprise was to generate and protect profits for the Enterprise members, including co-conspirator 1, the Officer Members, and me. I also admit that the DWI Enterprise developed a system to increase referrals to the law firm (both from Officer Members but also from other DWI Offenders who received a guaranteed outcome). I admit that this allowed the DWI Enterprise to grow in size and continue its illegal conduct. I also admit that the DWI Enterprise was structured to protect co-conspirator 1's status and reputation as an attorney. This allowed co-conspirator 1 to continue to appear in State court and at the MVD hearings on behalf of the various DWI Offenders, and to continue to grow the DWI Enterprise. I also admit that the DWI Enterprise's purpose was to conceal the illegal activity

involved with the DWI Offender's cases so that the Enterprise members could earn more profits and avoid prosecution.

23.    At all times relevant to Counts 2 through 6, of the Information, I further admit that sworn law enforcement officers employed by APD were agents of APD and that APD was an agency of the City of Albuquerque, a local government located within the District of New Mexico.

24.    I now understand that APD received more than $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, and insurance during each of the following one-year periods of time:

a.    February 1, 2019 – January 31, 2020

b.    February 1, 2020 – January 31, 2021

c.    February 1, 2021 – January 31, 2022

d.    February 1, 2022 – January 31, 2023

e.    February 1, 2023 – January 31, 2024.

25.    During each of the above-listed one-year periods, I, in coordination with co-conspirator 1, gave, offered, and agreed to give items of value to multiple sworn law enforcement officers employed by APD.

26.    The items of value included United States currency and also tangible property. In coordination with co-conspirator 1 and others, sworn law enforcement officers with APD were provided with free legal services for themselves and their friends and family members. With co-conspirator 1, I also arranged for sworn law enforcement officers to receive gift cards, free hotel rooms, and other gifts.

27.     I admit that the items of value were given to APD sworn law enforcement officers in connection with a transaction and a series of transactions involving $5,000 or more during each of the above-listed one-year periods.

28.     I further admit that, in giving, offering, and agreeing to give items of value to APD sworn law enforcement officers, co-conspirator 1 and I intended to influence and reward the sworn law enforcement officers to take, or for taking, actions that would lead to clients of co-conspirator 1's law firm evading criminal and/or administrative consequences related to the clients' DWI arrests.

29.     In exchange for payments in U.S. currency and other items of value, the sworn law enforcement officers were expected to take actions including, but not limited to, failing to appear for MVD hearings, failing to file criminal charges, failing to appear for pretrial interviews, and failing to appear for court settings. I knew that these actions were expected to lead to the dismissal of administrative and criminal proceedings despite sworn law enforcement officers with APD having a duty to cooperate fully in all aspects of the judicial process and to appear at court hearings, pretrial interviews, or MVD hearings.

30.     I also admit that I also worked in concert with co-conspirator 3, an Albuquerque criminal defense attorney, to give, offer, and agree to give property to co-conspirator 2, a sworn law enforcement officer with APD, related to a DWI arrest. In April 2023, co-conspirator 2 arrested Z.W. and charged them by criminal complaint with DWI. Z.W. retained co-conspirator 3 to represent them and, with consent, paid for the representation. At co-conspirator 1 and co-conspirator 3's request, I gave, offered, and agreed to give United States currency to co-conspirator 2 in exchange for co-conspirator 2's agreement to act, or to fail to act, in such a way that Z.W. would avoid criminal and administrative consequences related to their DWI arrest. In

his role as a sworn law enforcement officer, co-conspirator 2 was not due the property he received in concert with co-conspirator 1, co-conspirator 3, and me.

31.     Apart from the above-described Enterprise, I admit that I also participated in a conspiracy with co-conspirator 2, co-conspirator 4 (a sworn law enforcement officer with APD), and others to secure, or to attempt to secure, payment from DWI Offenders in exchange for no criminal charges being filed against them related to their DWI arrests. The conspiring APD officers would arrest DWI Offenders but release them without booking them into jail or filing charges. The conspiring APD officers would provide the DWI Offenders' contact information to me, and I would contact the DWI Offenders and attempt to get them to pay an upfront fee in United States currency in exchange for the conspiring APD officers never filing criminal charges.

32.     In several instances, I admit that the conspiring APD officers and I did not inform co-conspirator 1 about the arrests or the attempts to secure payments in exchange for charges not being filed.

33.     I admit to doing so in relation to the following two arrests, though these were not the only DWI Offenders who made payments under the scheme to secure payments in exchange for charges not being filed or who were solicited to make payments as part of that scheme:

>     a.  In February 2022, co-conspirator 4 arrested L.I. for DWI but did not charge L.I. or book L.I. into jail. Within days of L.I.'s arrest, I spoke with L.I. and advised that no charges would be filed related to L.I.'s DWI arrest if L.I. paid United States currency. L.I. agreed and paid United States currency. I admit that I kept a portion of the United States currency paid, and paid co-conspirator 4 a portion of the United States currency. In exchange for being paid the United States currency,

14

co-conspirator 4 agreed not to file, and did not file, criminal charges against L.I. related to L.I.'s DWI arrest.

b.  In April 2022, co-conspirator 2 arrested S.H. for DWI but did not charge S.H. or book S.H. into jail. Within days of S.H.'s arrest, I spoke with S.H. and advised that no charges would be filed related to S.H.'s DWI arrest if S.H. paid United States currency. S.H. agreed and paid United States currency. I admit that I kept a portion of the United States currency paid, and paid co-conspirator 2 a portion of the United States currency. In exchange for being paid the United States currency, co-conspirator 2 agreed not to file, and did not file, criminal charges against S.H. related to S.H.'s DWI arrest.

34.    I admit that in this conspiracy and within the broader DWI Enterprise, I acted in concert with other co-conspirators and intended to do so in order for the scheme and the Enterprise to succeed and profit. The Officer Members and conspiring APD officers and I relied on co-conspirator 1, co-conspirator 3, and other attorneys to handle any aspect of the scheme or the DWI Enterprise that required an attorney presence in court or administrative settings. Without the Officer Members or the conspiring APD officers agreement and participation, the high success rate of the Enterprise in avoiding criminal and administrative consequences for DWI Offenders would not have been possible. I played an integral role in the DWI Enterprise and the criminal scheme by soliciting new DWI Offenders as clients and then coordinating with co-conspirator 1, co-conspirator 3, and other attorneys and with the Officer Members and conspiring APD officers to ensure DWI Offenders who were represented by the attorney co-conspirators did not face administrative or criminal consequences related to their DWI arrests.

All members of the Enterprise and of the criminal scheme shared in the mutual benefits of the success of the schemes.

35.     I further admit that I now know this Enterprise and the above-described criminal scheme affected interstate commerce. I admit that non-prosecuted DWI cases affect interstate commerce. I now understand that fines and fees collected by the courts are sent to the State Treasurer who directs the money to the correct State of New Mexico fund. The State of New Mexico uses its various funds to participate in interstate commerce and to purchase items from companies who engage in interstate commerce. Because the DWI Enterprise allowed DWI Offenders to avoid convictions and the resulting fines and fees, the amount of money available to be transferred to the State of New Mexico's funds was decreased and the funds did not collect all the fines and fees to which it was entitled. Additionally, as a result of the efforts of the DWI Enterprise, DWI Offenders avoided administrative and criminal requirements to have interlock devices installed on their vehicles. Interlock devices are manufactured by and purchased from companies involved in interstate commerce. Finally, I admit that, when drivers avoid criminal culpability for DWI, the become more likely to drive while intoxicated in the future, and, the more often that a person drives while intoxicated, the more likely they are to have an accident. I admit that DWI-related accidents account for economic losses that impact interstate commerce and the use of interstate highways.

36.     I further admit that this conduct occurred in the District of New Mexico.

37.     By signing this agreement, the Defendant admits that there is a factual basis for each element of the crime(s) to which the Defendant is pleading guilty and agrees to affirm the facts set forth above during the plea colloquy. The Defendant agrees that the Court may rely on

any of these facts, as well as facts in the presentence report, to determine the Defendant's sentence, including, but not limited to, the advisory guideline offense level.

## RECOMMENDATIONS

38.     Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend as follows:

a.      As of the date of this agreement, the Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. Consequently, pursuant to U.S.S.G. § 3E1.1(a), so long as the Defendant continues to accept responsibility for the Defendant's criminal conduct, the Defendant is entitled to a reduction of two levels from the base offense level as calculated under the sentencing guidelines, and if applicable, a reduction of an additional offense level pursuant to U.S.S.G. § 3E1.1(b). Further, the United States is free to withdraw this recommendation if the Defendant engages in any conduct that is inconsistent with acceptance of responsibility between the date of this agreement and the sentencing hearing. Such conduct would include committing additional crimes, failing to appear in Court as required, and/or failing to obey any conditions of release that the Court may set.

b.      The Defendant understands that the above recommendations are not binding on the Court and that whether the Court accepts these recommendations is a matter solely within the discretion of the Court after it has reviewed the presentence report. Further, the Defendant understands that the Court may choose to vary from the advisory guideline sentence. If the Court does not

accept any one or more of the above recommendations and reaches an advisory guideline sentence different than expected by the Defendant, or if the Court varies from the advisory guideline range, the Defendant will not seek to withdraw the Defendant's plea of guilty. In other words, regardless of any of the parties' recommendations, the Defendant's final sentence is solely within the discretion of the Court.

39.     Apart from the recommendations set forth in this plea agreement, the United States and the Defendant reserve their rights to assert any position or argument with respect to the sentence to be imposed, including but not limited to the applicability of particular sentencing guidelines, adjustments under the guidelines, departures or variances from the guidelines, and the application of factors in 18 U.S.C. § 3553(a).

40.     Regardless of any other provision in this agreement, the United States reserves the right to provide to the United States Pretrial Services and Probation Office and to the Court any information the United States believes may be helpful to the Court, including but not limited to information about the recommendations contained in this agreement and any relevant conduct under U.S.S.G. § 1B1.3.

## **DEFENDANT'S ADDITIONAL AGREEMENT**

41.     The Defendant understands the Defendant's obligation to provide the United States Pretrial Services and Probation Office with truthful, accurate, and complete information. The Defendant represents that the Defendant has complied with and will continue to comply with this obligation.

42.     The Defendant agrees that any financial records and information provided by the Defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

43.     The Defendant agrees that, upon the Defendant's signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits in open court at the Defendant's plea hearing, shall be admissible against the Defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

44.     By signing this plea agreement, the Defendant waives the right to withdraw the Defendant's plea of guilty pursuant to Federal Rule of Criminal Procedure 11(d) unless (1) the court rejects the plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(5) or (2) the Defendant can show a fair and just reason as those terms are used in Rule 11(d)(2)(B) for requesting the withdrawal. Furthermore, the Defendant understands that if the court rejects the plea agreement, whether or not the Defendant withdraws the guilty plea, the United States is relieved of any obligation it had under the agreement and the Defendant shall be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted.

45.     The Defendant will not willfully fail to appear for any court appearance in this matter, nor willfully fail to surrender as ordered for service of any sentence.

46.     The Defendant agrees not to engage in conduct that would constitute a new crime. Offenses that would be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are not within the scope of this paragraph's agreement.

47.     Defendant agrees not to engage in conduct that would constitute obstructing or impeding the administration of justice under U.S.S.G. § 3C1.1.

## RESTITUTION

48.     The parties agree that, as part of the Defendant's sentence, the Court will enter an order of restitution pursuant to the Mandatory Victim's Restitution Act, 18 U.S.C. § 3663A, if applicable; if § 3663A is not applicable, the Court will enter an order of restitution pursuant to 18 U.S.C. §§ 3663 and 3664.

49.     No later than July 1 of each year after sentencing, until restitution is paid in full, the Defendant shall provide the Asset Recovery Unit, United States Attorney's Office, 201 Third Street NW, Suite 900, Albuquerque, New Mexico 87102, (1) a completed and signed financial statement provided to the Defendant by the United States Attorney's Office and/or the United States Probation Office and (2) a copy of the Defendant's most recent tax returns.

## WAIVER OF APPEAL AND POST-CONVICTION RIGHTS

50.     The Defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford the right to appeal a conviction and the sentence imposed. Acknowledging that, the Defendant knowingly waives the right to appeal the Defendant's conviction(s) and any sentence within or below the advisory guideline range as determined by the Court, as well as any order of restitution entered by the Court. This waiver extends to any challenge to the manner in which the sentence was determined or imposed, including the district court's authority to make findings supporting the sentence.

51.     The Defendant also waives the right to appeal any sentence imposed below or within the guideline range upon a revocation of supervised release in this cause number but may nonetheless appeal the determination of the revocation guideline range.

52.     The Defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c) where such denial rests upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a).

53.     In addition, the Defendant agrees to waive any collateral attack to the Defendant's conviction(s) and any sentence, pursuant to 28 U.S.C. §§ 2241, 2255, or any other extraordinary writ, except on the issue of defense counsel's ineffective assistance.

## GOVERNMENT'S ADDITIONAL AGREEMENT

54.     Provided that the Defendant fulfills the Defendant's obligations as set out above, the United States agrees that the United States will not bring additional criminal charges against the Defendant arising out of the facts forming the basis of the present information.

## VOLUNTARY PLEA

55.     The Defendant agrees and represents that this plea of guilty is freely and voluntarily made and is not the result of force, threats, or promises (other than the promises set forth in this agreement and any addenda). There have been no promises from anyone as to what sentence the Court will impose. The Defendant also represents that the Defendant is pleading guilty because the Defendant is in fact guilty.

## VIOLATION OF PLEA AGREEMENT

56.     The Defendant agrees that if the Court finds by a preponderance of the evidence that the Defendant has violated any provision of this agreement, the United States will be released from its obligations under the agreement.

57.     The Defendant further agrees that in the event the Court finds that Defendant has breached this plea agreement, thus releasing the United States of its obligations under the agreement, such events do not constitute a fair and just reason under Rule 11(d)(2)(B) for withdrawing the guilty plea(s) entered pursuant to this agreement.

58.     Following the Court's finding of a breach of this agreement by the Defendant, should the United States choose to pursue any charge that was either dismissed or not filed as a result of this agreement, the Defendant waives any defense to that charge or charges based on the lapse of time between the entry of this agreement and the Court's finding of a breach by the Defendant.

## SPECIAL ASSESSMENT

59.     At the time of sentencing, the Defendant will tender to the United States District Court, District of New Mexico, 333 Lomas Blvd. NW, Suite 270, Albuquerque, New Mexico 87102, a money order or certified check payable to the order of the **United States District Court** in the amount of $800 in payment of the special penalty assessment described above.

## ENTIRETY OF AGREEMENT

60.     This document and any addenda are a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties. This agreement is effective upon signature by the Defendant and an Assistant United States Attorney.

AGREED TO AND SIGNED this 24th day of January, 2025.

ALEXANDER M.M. UBALLEZ
United States Attorney


SHANA B. LONG
KATHERINE L. LEWIS
Assistant United States Attorney
201 Third Street, Suite 900
Albuquerque, New Mexico   87103
(505) 346-7274


I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of my client's rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement. In addition, I have explained to my client the elements to each offense to which she/he is pleading guilty. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.


Wayne Baker
Attorney for the Defendant


I have carefully discussed every part of this agreement with my attorney.   I understand the terms of this agreement, and I voluntarily agree to those terms.   My attorney has advised me of my rights, of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant sentencing guidelines provisions, and of the consequences of entering into this agreement.


Ricardo Mendez
Defendant


23